# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 08-CR-693 (JD) |
| | : | |
| MOHAMMAD REZA VAGHARI | : | |
| a/k/a "Mitch Vaghari" | : | |
| MIR HOSSEIN GHAEMI | : | |

## GOVERNMENT'S MEMORANDUM IN SUPPORT OF ADMISSIBILITY OF TRIAL TESTIMONY FROM DR. MATTHEW LEVITT

The government respectfully offers the following memorandum in support of its offer of trial testimony from Dr. Matthew Levitt.  Dr. Levitt would provide expert and percipient witness testimony on narrow grounds.  Those grounds are described below, and a description of the basis of Dr. Levitt's expertise and the relevance of his testimony also follows.  Finally, defendant Vaghari's fear that the government will somehow exploit Dr. Levitt's experience researching terrorist groups is unfounded; the government will gladly work with the Court and defense counsel to limit the jury's exposure to Dr. Levitt's terrorism scholarship, including express instructions to the jury, if desired.

## ANTICIPATED EXPERT TESTIMONY

The government will elicit testimony from Dr. Levitt on the following grounds:

A.      A comprehensive regime of sanctions[1] govern United States persons with respect to the transfer of goods or technology with Iran. No similar restrictions govern trade with the United Arab Emirates.

B.      As a result of the comprehensive trade sanctions on Iran, trans-shipment is a common *modus operandi* to evade the sanctions. A simple definition of trans-shipment is the transfer of goods (here, to Iran) via at least one intermediary stop, which is often represented to the seller of the goods as the final destination of the goods. Dubai is the primary location in the world through which goods and technology are trans-shipped to Iran.

The government has not shared the facts of this prosecution with Dr. Levitt, and, in accordance with Fed. R. Evid. 704(b) and governing Third Circuit authority (*see infra*), he will not be asked to offer an opinion on the defendants' knowledge or intent in this case.

## ANALYSIS

Federal Rule of Evidence 702 provides the legal framework for evaluating proposed expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts, or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[1]      Dr. Levitt will offer this testimony at a general level. Instructing the jury on the specific sanctions/law relevant to this case is the exclusive province of the Court. *See, e.g., United States v. Hill*, 167 F.3d 1055, 1069 (6th Cir. 1999) ("[I]t is within the sole province of the court to determine the applicable law and instruct the jury as to that law.") (quotation omitted).

The Third Circuit has distilled "three distinct substantive requirements on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). Dr. Levitt's proposed testimony satisfies each of these requirements.

### I.   Qualifications

Rule 702 speaks broadly about the types of expert witnesses that are contemplated ("scientific, technical, or other specialized knowledge) and the types of backgrounds that may support their qualification as an expert ("knowledge, skill, experience, training, or education"). The Advisory Committee elaborated on the expansive policy reflected in Rule 702:

> The rule is broadly phrased. The fields of knowledge which may be drawn upon are not limited merely to the "scientific" and "technical" but extend to all "specialized" knowledge. Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by his "knowledge, skill, experience, training or education." Thus within the scope of the rule are not only experts in the strictest sense of the word, *e.g.*, physicians, physicists, and architects, but also the large group sometimes called "skilled" witnesses, such as bankers or landowners testifying to land values.

Fed. R. Evid. 702, Advisory Committee's Notes to 1972 Proposed Rule 702. Not surprisingly, the Third Circuit has repeatedly confirmed that "[w]e have interpreted Rule 702's qualifications requirement liberally." *United States v. Watson*, 260 F.3d 301, 307 (3d Cir. 2001) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994)).

Under any interpretive standard, Dr. Levitt plainly qualifies as an expert in the area of enforcement/evasion of the U.S. trade sanctions on Iran. Indeed, just last month, he testified as an expert witness in a federal criminal trial in the Southern District of New York — *United States*

*v. Banki* (10-CR-008) (Keenan, J.)[2] — involving a conspiracy to violate those trade sanctions on

Iran.  He is the leading scholar at the Washington Institute for Near East Policy, a highly regarded

think tank in Washington, D.C. that devotes significant scholarly attention to the subject of the

efficacy of trade sanctions in addressing transnational threats to American security (such as the

threats posed by Iran).  During his tenure as Deputy Assistant Secretary for Intelligence and Analysis

in the Department of the Treasury (2005-2007), it was his responsibility to monitor enforcement

efforts and consistently update the sanctions on Iran and other threats.  *See, e.g., Better Box*

*Commc'ns Ltd. v. BB. Tech, Inc.*, 300 F.3d 325, 327-38 (3d Cir. 2002) ("This Court has held that

specialized knowledge may derive from practical experience as well as academic training and

credentials, and has interpreted the specialized knowledge requirement liberally.") (quotations

omitted).  Some of his other relevant qualifications include:

- Lecturer in International Relations & Strategic Studies at one of the premier foreign
  policy institutions in this country, the School of Advanced International Studies
  (SAIS) at Johns Hopkins University.  Since 2007, he has taught a graduate-level
  course at SAIS entitled "Combatting the Funding of Transnational Threats;"

- He is a term member on the Council on Foreign Relations, an independent foreign
  policy think-tank;

- He has published widely on the subject of enforcing trade sanctions on Iran,
  including the following sample[3]—

---

[2]    The indictment may be viewed via the Internet at:
<http://www.scribd.com/doc/24907525/Mahmoud-Reza-Banki-Indictment>

[3]    Internet links to these publications may be found on his resume, which the government
produced to the defendants in early May 2010.

_**Monographs**_:
—*Combating the Financing of Transnational Threats*, co-authored with Michael Jacobson, Emirates Lecture Services #76 (Abu Dhabi: The Emirates Center for Strategic Studies and Research, 2009);[4]

_**Journal Articles:**_
—"What Europe Can Do to Secure a Deal with Iran," *Europe's World* (Spring 2010);

—"Why the Iran Sanctions Matter," *Foreign Policy*, June 11, 2010;
<http://www.foreignpolicy.com/articles/2010/06/11/why_the_iran_sanctions_matter>

_**Editorial Articles:**_
—"The World Can't Trust Iran," co-authored with Michael Jacobson, *The Guardian*, September 26, 2009;

—"GAO Misleads on Iran Sanctions," Middle East Strategy at Harvard (MESH), January 17, 2008;

—"The Clock Ticks: Sanction Iran Now," *Financial Times Deutschland* (German), December 19, 2007;

—"Contending with Iran's Nuclear Intentions and Capabilities," *San Francisco Chronicle*, December 5, 2007;

—"Can Sanctions Be Effective in Halting Iran's Nuclear Program?" Council on Foreign Relations online debate, October 15 -18, 2007;

—"Making Iran Feel the Pain," *Wall Street Journal Europe*, July 2, 2007;

—"Pulling Tehran's Purse Strings," Transatlantic Issues #16, May 4, 2007;

—"Target Iranian Forces," *The Washington Times*, February 16, 2007;

_**Washington Institute Policy Briefs:**_
—"Iran Sanctions: Can They Be Effective?" Policywatch #1297, October 25, 2007;

---

[4]   This engagement brought Dr. Levitt directly into contact with public and private sector officials in the United Arab Emirates to discuss the trans-shipment of goods to Iran via the UAE — the crux of his expert testimony in this case.

—"New Multilateral Consensus Emerges on Iran," with Patrick Clawson, Policywatch #1633, February 23, 2010.

Furthermore, he has testified before both U.S. House and Senate committees addressing the comprehensive trade sanctions on Iran. *See, e.g.,* "Minimizing Potential Threats from Iran: Assessing Economic Sanctions and Other U.S. Policy Options," Testimony before Senate Committee on Banking, Housing and Urban Affairs, U.S. Senate, July 30, 2009; "Pulling Tehran's Purse Strings: Leveraging Sanctions and Market Forces to Alter Iranian Behavior," testimony before the House of Representatives Committee on Foreign Affairs Subcommittee on Terrorism, Nonproliferation and Trade and Subcommittee on the Middle East and Central Asia, March 15, 2007.

As a further sign of his expertise in this field, he has been invited to lecture widely on the issue, including the following:

—"Iran's Economic Health and the Impact of Sanctions," panelist at Carnegie Endowment for International Peace, Washington, D.C., April 27, 2010*;*

—"Contending with Transnational Threats," Counterterror Expo 2010, London, UK, April 15, 2010;

—"Can Sanctions Work Against Iran?" Indiana University, Bloomington, Indiana, November 30, 2009;

—"The Utility of Targeted Financial Measures to Deal with Iran," Brandeis University's Crown Center for Middle East Studies, Waltham, MA, November 13, 2008;

—"Targeted Financial Measures to Protect National Security," Treasury Legal Division annual conference, U.S. Mint, Washington, DC, February 29, 2008;

— Moderated session with Under Secretary of the Treasury Stuart Levey on "Iran Sanctions: Where We are and Where We are Going," Radio Free Europe/Radio Liberty, Washington, DC, October 16, 2007;

—"Confronting the Iranian Threat," Anti-Defamation League Leadership Conference, Washington, DC, April 30, 2007;

—"Can Sanctions and Financial Restrictions Avoid a Showdown with Iran?" Transatlantic Institute Roundtable Discussion at the Residence Palace, Brussels, Belgium, April 24, 2007.

By any measure and under any standard, Dr. Levitt is exceptionally well-qualified to offer expert testimony regarding U.S. trade sanctions on Iran.

## II.    *Reliability*

Consistent with the other facets of the Rule 702 inquiry, the standards for assessing the reliability of expert testimony are flexible and permissive.  The Supreme Court famously emphasized the trial judge's duty to ensure that the reasoning and methodology of expert witnesses are scientifically valid in *Daubert v. Merrill Dow Pharmaceuticals,* 509 U.S. 579, 592-593 (1993).  The Court later clarified that the same "gate-keeping" inquiry should be made of both scientific and non-scientific inquiries.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 137 (1999).  *Daubert* and *Kumho Tire* both took great care to emphasize, however, that the standards for evaluating the reliability of an expert's methodology are "flexible" — *see Kumho Tire*, 526 U.S. at 150; *Daubert*, 509 U.S. at 594 — and that *Daubert*'s list of specific factors neither necessarily nor exclusively applied to all experts or in every case.  Rather, the fundamental inquiry in every case should be whether the expert's testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see also, e.g., Better Box Commc'ns Ltd.*, 300 F.3d at 327-38 ("This Court

has held that specialized knowledge may derive from practical experience as well as academic training and credentials, and has interpreted the specialized knowledge requirement liberally.") (quotations omitted).  In that task, the law grants a trial judge the same broad latitude to decide *how* to determine reliability as the judge enjoys with respect to the ultimate reliability determination. *Kumho Tire*, 526 U.S. at 150.

Dr. Levitt's expertise in the area of Iran sanctions derives from almost every source imaginable.  A sample of his significant scholarly research on the topic is listed *supra*, and the think-tank that he leads in Washington devotes considerable academic attention (through lectures, symposia, and publications) to the subject of the efficacy of the Iran embargo.  For that reason, among others, U.S. Congressional committees have requested that he illuminate for them the relevant issues in this area.  In connection with his scholarly research, Dr. Levitt has interacted closely with relevant officials in government and the private sector (such as bank and shipping employees) in both the United States and beyond (Australia, European Union, and the United Arab Emirates, as examples).

Moreover, Dr. Levitt was intimately involved with the Iranian sanctions regime on a day-to-day basis during his two years as a senior official in the Treasury Department.  Some of his many responsibilities were updating and improving the targeted financial measures that comprise the trade sanctions on threats to American security, such as Iran.  Knowledge of the means of evading the sanctions was at the core of his job.  Though he lacks personal knowledge of the facts of this case, it bears noting that Dr. Levitt's experience in the Treasury Department coincides largely with the charged criminal conduct in this case; in other words, he was constantly endeavoring to evaluate and improve the trade sanctions against Iran at the same time that the defendants were

endeavoring to evade those same sanctions. More relevant practical experience can hardly be imagined.

Dr. Levitt's practical experience and research goes even deeper and further enriches his perspective on the relevant issues. He has personally inspected shipping ports in the United Arab Emirates, including Jebal Ali, the free trade zone near Dubai. On multiple trips to the UAE, he has devoted hours to watching boats traveling down Dubai Creek (the waterway that roughly divides the Emirate) toward Iran — boats loaded with boxes of refrigerators, pipes, cars, and other goods marked "Final Port of Entry: Jebal Ali" (in other words, goods being trans-shipped to Iran via the UAE). Dr. Levitt did not content himself with those distant observations; he interviewed boat captains and other workers on the boats to confirm that they were, in fact, trans-shipping the goods to Iran via the UAE.

Dr. Levitt possesses a rare combination of practical and scholarly expertise on the subject of Iran sanctions and, specifically, on the evasion of those sanctions by trans-shipping goods to Iran via the UAE. Pursuant to Fed. R. Evid. 104(a), this Court should find that his information is reliable and allow the jury to evaluate his testimony.

### III.    *Fit*

This Court has "broad discretion" to admit expert testimony, based upon whether it is helpful to the trier of fact. *See, e.g., United States v. Gibbs*, 190 F.3d 188, 211 (3d Cir. 1999). Notably, the governing legal authority — including the basic, governing test of relevance: "evidence having any tendency to make the existence of any fact that is of consequence to the determination

-9-

of the action more probable or less probable," Fed. R. Evid. 401[5] — favors the admission of expert

testimony.  There is a "'strong and undeniable preference for admitting any evidence having some

potential for assisting the trier of fact' which is embodied in the Federal Rules of Evidence." *United*

*States v. Velasquez*, 64 F.3d 844, 849 (3d Cir. 1995) (quoting *DeLuca v. Merrell Dow Pharm., Inc.*,

911 F.2d 941, 956 (3d Cir. 1990)).[6]  A lay jury will likely not be familiar with the scope of the trade

sanctions on Iran, or the concept of trans-shipment as a means of evading those sanctions.  For that

matter, some jurors may be unfamiliar with the sheer physical proximity between Iran and Dubai,

not to mention the United Arab Emirates emergence as a major hub for trans-shipment activity to

Iran.  Dr. Levitt is exceedingly well-qualified to provide this critical evidence.  These subjects are

highly relevant to the question of the defendants' knowledge and intent, and are plainly the proper

subject of expert testimony.

---

[5]     *See, e.g., United States v. Ford*, 481 F.3d 215, 218 (3d Cir. 2007) (noting that the "fit" inquiry "should be evaluated under the standard expressed in Rule 401 of the Federal Rules of Evidence.").

[6]     Notably, the seminal opinion in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), was aimed at expanding, not restricting, the admissibility of expert opinion under Rule 702, in keeping with the Supreme Court's view of the "'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.'"  *Id.* at 588 (quoting *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 169 (1988)).  Thus, *Daubert* rejected the long-prevalent *Frye* doctrine, *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which held that a scientific theory was admissible only if it enjoyed "general acceptance" in the pertinent community of expertise.  The Supreme Court held that *Frye* was unduly restrictive in light of Rule 702.  The *Daubert* Court responded to the concerns of some that its ruling would open the floodgates to all manner of questionable expert opinions, stating that those critics are "overly pessimistic about the capabilities of the jury and of the adversary system generally.  Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 595-96.

Dr. Levitt's testimony seeks simply to illuminate an unfamiliar area in order to place the trial evidence in proper context. Courts have repeatedly and strongly endorsed the use of expert witnesses for this purpose. In particular, courts have emphasized that the trial's truth-seeking purpose is advanced by allowing expert witnesses to testify about the common *modus operandi* of violators of different laws.

The Third Circuit has spoken to this issue most often in the context of the *modus operandi* of narcotics distribution, instructing trial courts that "[i]t is settled law that an expert may testify about common behavior patterns in a profession or subculture." *United States v. Price*, 458 F.3d 202, 212 (3d Cir. 2006) (permitting expert witness to testify that drug dealers often carry firearms); *see also, e.g., United States v. Davis*, 397 F.3d 173, 178-79 (3d. Cir. 2005) (permitting expert witness to testify that the possession of handguns along with certain quantities of narcotics was consistent with drug trafficking); *United States v. Perez*, 280 F.3d 318, 342 (3d Cir. 2002) (permitting expert witness to explain that drug traffickers often use pagers and certain cellular phones to avoid detection by law enforcement officers); *United States v. Watson*, 260 F.3d 301, 309 (3d Cir. 2001) ("It is well established that experts may describe, in general and factual terms, the common practices of drug dealers"— including certain counter-surveillance techniques, the quantity and purity of narcotics sold in an area, the street value of narcotics in an area, and the meaning of code words in the narcotics trade); *United States v. Gibbs*, 190 F.3d 188 (3d Cir. 1999) (permitting expert witness to interpret commonly used code language of drug traffickers). This proposition has been uniformly adopted across the country, as well. *See, e.g., United States v. Plunk*, 153 F.3d 1011, 1017 (9th Cir. 1998); *United States v. Griffith*, 118 F.3d 318, 321 (5th Cir. 1997); *United States v. Delpit,* 94 F.3d 1134, 1145 (8th Cir. 1996); *United States v. Boyd*, 55 F.3d 667, 671 (D.C. Cir. 1995);

United States v. Gastiaburo, 16 F.3d 582, 589 (4th Cir. 1994); United States v. Boissoneault, 926 F.2d 230, 232 (2d. Cir. 1991); United States v. Solis, 923 F.3d 548, 549-51 (7th Cir. 1991).

Fellow district courts in the Eastern District have applied this governing law.  For instance, the Honorable Anita B. Brody permitted a veteran narcotics investigator to testify pursuant to Fed. R. Evid. 702 about the common modus operandi of packaging and distributing crack cocaine. See United States v. Rich, 326 F. Supp. 2d 670, 677 n.5 (E.D. Pa. 2004) ("[T]he Third Circuit has held that the kind of expert testimony offered in this case is appropriate.").  In two other cases, the Honorable R. Barclay Surrick permitted experienced narcotics investigators to testify pursuant to Rule 702 about the "operations of a large-scale drug distribution business" and "the behavior of drug dealers and their methods of operation," United States v. Walker, No. 05-440-11, 2008 WL 2805605 at *2 & 3 (E.D. Pa. July 18, 2008), as well as "the modus operandi of individuals involved in drug trafficking," United States v. Dover, No. 96-181-1, 2002 WL 32351180, at *11 (E.D. Pa. May 17, 2002) (unpublished).

The Third Circuit's broad endorsement of expert testimony about the common modus operandi of certain crimes is not confined to the narcotics context.  For example, in United States v. Hayward, 359 F.3d 631, 636 (3d Cir. 2004), a case involving sexual activity with a minor, the court permitted the expert testimony of a behavioral scientist about the "patterns exhibited by many acquaintance molesters, including selection of victims from dysfunctional homes, formulation of a customized seduction process, lowering the victim's inhibitions about sex, isolating the victim, and soliciting the victim's cooperation in the victimization process." See also, e.g., United States v. Hitt, 473 F.3d 146, 158 (5th Cir. 2006) (permitting expert testimony about typical behavior of child molesters); United States v. Romero, 189 F.3d 576, 582 (7th Cir. 1999) (permitting expert testimony

-12-

about the "methods and techniques employed by preferential child molesters"); *cf. United States v. Williams*, No. 05-CR-443, 2007 WL 3118306, at *5 (M.D. Pa. Oct. 19, 2007) (unpublished) (permitting expert testimony about the common *modus operandi* of pimps and prostitutes to provide context for the prostitutes' mental state) (*citing United States v Taylor*, 239 F.3d 994, 998 (9th Cir. 2001) (same), and *United States v. Anderson*, 851 F.2d 384, 392-93 (D.C. Cir. 1988) (same)). Likewise, in *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006), the Third Circuit endorsed the use of an expert witness to illustrate the common practices of offshore securities transactions; the evidence was probative because the defendant's knowledge and intent concerning a particular transaction was the key issue in the case, and the expert's testimony provided the jury with context for evaluating the defendant's actions and mental state.  Similarly, in the instant case, Dr. Levitt's testimony about the common *modus operandi* of sanction-busters of using Dubai to trans-ship goods to Iran provides important context for the jury's evaluation of the defendant's actions and mental state (including their willful blindness).

Importantly, Dr. Levitt's testimony will not run afoul of Fed. R. Evid. 704(b) because he will not be asked any questions about the intent or culpability of the conspirators in this Indictment.  The Third Circuit has made clear that "expert testimony is admissible if it merely supports an inference or conclusion that the defendant did or did not have the requisite *mens rea*, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony."  *United States v. Bennett*, 161 F.3d 171, 185 (3d Cir. 1998) (quotation omitted).  The Third Circuit's decision in *Watson* illustrates the limit allowed by the Third Circuit (to which Dr. Levitt's testimony will not even come close).  In *Watson*, the Third Circuit held that "[e]xpert testimony concerning the *modus operandi*

-13-

of individuals involved in drug trafficking does not violate Rule 704(b)." 260 F.3d at 308. The prosecutor in *Watson* went too far, though, by asking an expert to opine specifically on the intent of the defendant on trial. *Id.* at 306, 309-10.[7] In the instant case, by contrast, it would be impossible for the government to cross this line because Dr. Levitt has not and will not be exposed to the factual evidence regarding the conspirators' conduct and/or mental states. Thus, his opinion on those ultimate issues — which might trigger Rule 704(b) — cannot and will not be sought.

Defendant's brief in opposition to Dr. Levitt's testimony unpersuasively claims that his substantial expertise in the area of Iran sanctions is somehow rendered radioactive by *other* subjects of his expertise, namely, terrorist groups. We agree with defense counsel that this is not a terrorism case, and we do not proffer Dr. Levitt's testimony to suggest otherwise. By the same token, Dr. Levitt's scholarly work on the subject of terrorism should not *disqualify* him from presenting highly probative evidence on *other* topics. As demonstrated earlier, his expertise on the subjects of this prosecution is more than sufficient such that the "terrorism" aspects of his scholarly

---

[7]    In contrast, the Third Circuit has made clear in numerous decisions that a court may admit expert testimony from which a jury can infer the necessary mental state, so long as the expert witness does not state the ultimate conclusion. For example, in *United States v. Davis*, 397 F.3d 173 (3d Cir. 2005), an expert testified that the circumstances of the defendants' conduct — where they were found in a group, armed with weapons, and carrying multiple packets of narcotics — were "consistent" with an intent to traffic. The Court held that this testimony was permissible, given that the witness did not state an opinion regarding the defendants' intent, and merely provided expert knowledge from which the jury could draw the conclusion. *Id.* at 179. *See also United States v. Price*, 458 F.3d 202, 212 (3d Cir. 2006) (testimony that drug dealers are very likely to carry guns, and drug buyers almost never do, was "entirely legitimate," to provide evidence from which a jury could infer the requisite mental state for drug trafficking, without stating the ultimate opinion); *United States v. Hayward*, 359 F.3d 631, 636 (3d Cir. 2004) (expert testimony about the patterns exhibited by "acquaintance child molesters" was admissible because the witness drew no conclusion about the defendant's personal intent).

-14-

work do not need to be emphasized to the jury (or, in some cases, presented at all).[8]    Most importantly, this Court's ability to focus the jurors' attention on proper matters is substantial.  *See United States v. Syme*, 276 F.3d 131, 155 (3d Cir. 2002) ([W]e presume . . . that the jury follows a district court's instructions."); *Jermyn v. Horn*, 266 F.3d 257, 312 (3d Cir. 2001) (citation omitted) ("[W]e must presume that the jury followed the court's instructions[.]"); *United States v. Newby*, 11 F.3d 1143, 1147 (3d Cir. 1993) (jury presumed to follow curative instructions regarding stricken evidence absent "overwhelming probability" jury was unable to follow it). The government will gladly work with the Court and defense counsel to limit or otherwise shape the presentation to the jury of Dr. Levitt's background to ameliorate any concerns in this regard.

The strong medicine of excluding probative evidence under Rule 403 is unwarranted in this case.  The defendants will apparently not contest that they undertook most of the actions alleged in the indictment.  Rather, their defense will rise or fall based on the jury's assessment of their mental state— in other words, the key issue in the case will be whether the defendants knew that the goods they shipped to Dubai were destined for Iran in violation of federal law.  Dr. Levitt's testimony, provides critical evidence for the jurors to evaluate this key issue, both in terms of explaining the concept of trans-shipment, generally, and identifying some common *modus operandi* of those who violate the Iran embargo through trans-shipment.  There is no more important dispute in the case, and Dr. Levitt's testimony offers probative evidence directly on point.

---

[8]    By the same token, if some of his terrorism research <u>did</u> become known to the jury somehow, a dichotomy could be easily drawn for the jury — between his terrorism work and his sanctions work — that would further dispel any suggestion that this prosecution involves terrorism.

The probative force of Dr. Levitt's testimony is not outweighed by any unfair prejudice that the defendants might suffer from its admission at trial — and certainly not "substantially" so, as Rule 403 requires to justify the exclusion of probative evidence.  *See* Fed. R. Evid. 403 ("[E]vidence may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice . . . .") (emphasis supplied).  Rule 403

> does not offer protection against evidence that is merely prejudicial, in the sense of being detrimental to a party's case.  Rather, the rule only protects against evidence that is <u>unfairly</u> prejudicial.  Evidence is unfairly prejudicial only if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Advisory Committee's Note, F.R.Evid. 403.

*Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980) (emphasis in original).  Evidence is not *unfairly* prejudicial simply because it undermines the defense theory of the case.  Rather, to justify exclusion under Rule 403, there must be something about the evidence that would cause jurors to abandon their rational thought processes and disregard a limiting instruction from the Court.  Absent such an uncontrollable emotional force, jurors are presumed to be able to apply the evidence for its intended, limited purpose.

There is no such uncontrollable emotional force at play here, and certainly not one supplied by aspects of Dr. Levitt's background that do not even need to be presented to the jury in the first place.  As such, there is no lawful basis to exclude his highly probative evidence pursuant to Rule 403.

-16-

## <u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that the Court permit the trial testimony of Dr. Matthew Levitt pursuant to Fed. R. Evid. 702.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


   /s/
_____
NANCY B. WINTER/STEPHEN A. MILLER
Assistant United States Attorneys

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the Government's Memorandum in Support of Admissibility

of Trial Testimony of Dr. Matthew Levitt was served by electronic mail on defense counsel:

William A. DeStefano, Esq.              David Kozlow, Esq.
Terri A. Pawelski, Esq.                 Mark Wilson, Esq.
Buchanon Ingersoll & Rooney PC          Defender Association of Philadelphia
1835 Market Street, 14th Floor          601 Walnut Street, Suite 540 West
Philadelphia, PA 19103-2985             Philadelphia, PA 19106


/s/_____
STEPHEN A. MILLER
Assistant United States Attorney


Date:   June 14, 2010