## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 08-CR-693 (JED) |
| | : | |
| MOHAMMAD REZA VAGHARI | : | |
| and MIR HOSSAIN GHAEMI | | |

## DEFENDANT VAGHARI'S MEMORANDUM IN FURTHER SUPPORT
## OF MOTION TO PRECLUDE THE GOVERNMENT FROM OFFERING EXPERT
## TESTIMONY AT TRIAL FROM DR. MATTHEW LEVITT

Defendant Mohammad ("Mitch") Vaghari in the above-captioned criminal action, by and

through his attorneys of record, respectfully submits this memorandum in support of his motion

to preclude the government from offering vaguely described, "expert and percipient witness

testimony" at trial from Dr. Matthew Levitt.

### I.    INTRODUCTION AND SUMMARY OF ARGUMENTS

From his Curriculum Vitae ("CV"), writings and speeches, it is clear that Dr. Levitt is

both a student of international terrorism and a vocal and prolific advocate of banking and

financial sanctions to combat international terrorism. The words "terror," "terrorism," "threats,"

"Hamas," "Hizbollah," "Al Qaeda," "Jihad," and "Jihadism," appear nearly 300 times in Dr.

Levitt's lengthy CV. The problem, however, is that this case in not about international terrorism,

nor is it about Iran's nuclear capability or the geo-political rational for imposing trade sanctions

on Iran. Nor, unlike *United States v. Banki,* is this case about complex international financial

transactions. Rather, the issue in this case is simply whether the Defendants violated regulations

promulgated pursuant to IEEPA, which prohibit the sale of goods to Iran, without a license, by

shipping consumer goods and laboratory equipment to Dubai, with the knowledge and intent that they were actually destine for end-users in Iran.

   As will be discussed more fully below, the government should be precluded from eliciting expert or "percipient witness" testimony from Dr. Levitt at trial.

   First, the jury does not need expert testimony to understand the government's evidence or to determine the facts pertaining to the allegations in the Indictment.  This case is not about the "sanctions" that the government wants Dr. Levitt to talk about in "Part A" of the Government's Memorandum in Support of Admissibility of Trial Testimony from Dr. Matthew Levitt ("government's memo.").  Rather, this case is about whether the Defendants knowingly and intentionally violated one or more of the regulations promulgated under IEEPA.  Moreover, there is no contention in this case that the United States has similar restrictive regulations in place against Dubai.  By their very terms, the export regulations at issue here only apply to Iran. Therefore, there is no need for expert testimony on this issue.

   Second, the Court is perfectly able to instruct the jury on the law pertaining to this case, and the jury will understand the Court's instruction without any help from Dr. Levitt.  As indicated by the government's proposed jury instructions, the law pertaining to this case is found in the regulations prohibiting the indirect exportation of goods to Iran.  By contrast, the sanctions that the government wants Dr. Levitt to opine on are really the geo-political reasons for imposing the regulations, i.e. to try to prevent Iran from supporting terrorism or developing a nuclear capability.  Since the reasons or wisdom behind the applicable laws are regarded as irrelevant, and the jury is always instructed not to question whether the law is wise or unwise, we submit it would not only be erroneous but also highly prejudicial for the Court to allow Dr. Levitt to respond to questions regarding the "comprehensive regime of sanctions [that prohibit the

exportation of goods to Iran]."  Moreover, to the extent that the government wants Dr. Levitt to discuss the actual regulations pertaining to this case, such testimony would usurp the function of the Court and set Dr. Levitt up as a second and possibly more authoritative judge in this case, advocating the government's position.

Third, the government has not shown Dr. Levitt to be adequately qualified to render *modus operandi* testimony relevant to the specific charges in this case, even if such facts were beyond the kin of the average juror, which they are not.  While the government points to many articles, lectures and symposia by Dr. Levitt, a reading of same disclosed that they: 1) advocate the *necessity of sanctions* in order to combat  international terrorism or nuclear proliferation; and 2) are largely limited to sanctions against international banking or financial transactions and do not pertain to the relevant regulations in this case.

Fourth, even if Dr. Levitt was qualified on facts relevant to the government's alleged *modus operandi* in this case, which he is not, there is no showing that his proposed testimony is based on sufficient facts or data, that the testimony is based on reliable principles and methods, or that the witness has applied such principles and methods reliably to the facts of this case.  The government's argument that Dr. Levitt has "personally inspected shipping ports in the United Arab Emirates" and "...devoted hours to watching boats traveling down Dubai Creek....loaded with boxes of [consumer goods] marked 'Final Port of Entry: Jebal Ali'" tells us very little about Dr. Levitt's principles and methods or their reliability.  Furthermore, Dr. Levitt's "hours of watching boats," that could have been carrying cargo from any place in the world other than the United States, pales in comparison to the "expert" narcotics officer with 20 years of experience and thousands of arrests who is allowed to testify regarding *modus operandi* facts in the cases cited by the government.

3

## II.   PROCEDURAL HISTORY

By letter of May 5, 2010, counsel for the government informed defense counsel that the government intended to qualify Dr. Matthew Levitt as an expert witness at trial "on efforts to evade U.S. trade sanctions governing trade with the Islamic Republic of Iran." The government explained in its disclosure letter that: "In particular, Dr. Levitt will testify that the United Arab Emirates is a location through which technology is <u>often</u> trans-shipped from the West to Iran. He will offer both expert and percipient witness testimony about this <u>smuggling</u> activity, as well <u>'assorted observations'</u> about the nature of and the facts related to Iran's government infrastructure, universities and industry." (emphasis added).

On June 1, 2010, Mr. Vaghari filed a motion to preclude the government from offering expert or percipient witness testimony from Dr. Levitt. Defendant's motion pointed out that the proposed testimony was vaguely described in the government's letter and that the purported disclosure violated Fed. R. Crim. P. 16(a)(1)(G) by omitting an adequate description of Dr. Levitt's opinions, the bases and reasons for each opinion or the specific qualifications of Dr. Levitt. Second, Mr. Vaghari observed that the government's purported disclosure did not provide the Court with an adequate basis to decide whether the proposed testimony is admissible under either Rule 701 or Rule 702 of the Federal Rules of Evidence. For purposes of Rule 701, the government's purported disclosure did not assist the Court in deciding whether Dr. Levitt's proposed opinions or inferences were: 1) rationally based on his perceptions; 2) helpful to a clear understanding of his testimony; or 3) would assist the jury in the determination of a fact at issue in this case. For purposes of Rule 702, the government's purported disclosure letter made no showing that any of Dr. Levitt's proposed opinions were based on sufficient facts or data; the

product of reliable principles and methods; or that the witness had applied these principles and methods reliably to the facts of this case.

We further submitted that the scant probative value of Dr. Levitt's proposed testimony, if any, was substantially outweighed by the prospect that such testimony will confuse and mislead the jury and that Defendants will likely suffer extreme prejudice as a result of a recitation of Dr. Levitt's credentials as an expert on international terrorism. Thus, we argued that Dr. Levitt should be precluded as a witness in this case under Federal Rule of Evidence 403 since this case had nothing to do with terrorism but Dr. Levitt's CV discloses that his entire background and professional experience has focused on international terrorism and Islamic religious sects that have taken credit for terrorist activities. Moreover, virtually all of the cases in which Dr. Levitt has previously testified were terrorism cases.[1]

On June 14, 2010, the government submitted its Memorandum in support Dr. Levitt's trial testimony, which provided a modified description of his proposed testimony. In its Memorandum, the government also offers to work with defense counsel and the Court to limit the jury's exposure to Levitt's terrorism credentials and experience. In any event, the government now seeks to elicit testimony from Dr. Levitt at trial which is again vaguely described as follows:

A.  A comprehensive regime of sanctions govern United States persons with respect to the transfer of goods or technology with Iran. No similar restrictions govern trade with the United Arab Emirates.

B.  As a result of the comprehensive trade sanctions on Iran, trans-shipment is a common *modus operandi* to evade the sanctions. A simple definition of trans-shipment is the transfer of goods (here, to Iran) via at least one intermediary stop, which is often represented to the seller of the goods as the final destination of the goods. Dubai is the primary location in the world through which goods and technology are trans-shipped to Iran.

---

[1]  The sole exception to this statement is *United States v. Banki*. There, however, Dr. Levitt was called upon to explain a complex and sophisticated international financial or banking transactions which admittedly seems to be his secondary area of expertise.

Government's Memorandum in Support of Admissibility of Trial Testimony from Dr. Matthew

Levitt, at p.2.

### III.    ANALYSIS

    1.    **The Proposed Testimony Will Not Assist The Trier Of Fact to Understand the Evidence or Determine a Fact In Issue; Invades The Province of the Judge and Jury; and Is Precluded by Fed. R. Evid. 704(b)**

Part A of the government's description of Dr. Levitt's proposed testimony is vague and

ambiguous.  Precisely what Levitt intends to testify about "[a] comprehensive regime of

sanctions" that govern the transfer of goods and technology from the United States to Iran is

unclear.  As mentioned above, the sanctions themselves are not the law applicable to this case

but rather, the geo-political reasons for imposing the applicable regulations.  These reasons,

however, are irrelevant to this case.  Moreover, it would be equally improper for Dr. Levitt to

interpret or offer his opinions regarding the regulations at issue here.  This would usurp the

function of the Court.  Finally, as discussed above, opinion testimony that the regulations do not

apply to Dubai is wholly unnecessary in this case because by their very terms, the regulations

only apply to Iran.

Part B of Dr. Levitt's proffered testimony gains slightly more specificity than Part A but

suffers from some of the same problems.  First, the jury does not need an expert witness to define

the term "trans-shipment."  Moreover, the regulations themselves adequately define and explain

this term.  31 C.F.R. § 560.204 (which the government has submitted in Request #41) explains

that the prohibited conduct includes direct *or indirect* shipment of goods to Iran.  The Regulation

goes on to prohibit the shipment of goods to a "third country undertaken with knowledge or

reason to know that such goods are intended specifically for supply, trans-shipment or re-

exportation directly or indirectly to Iran."  Nor is there any need for the jury to understand any

special *modus operandi* facts in this case given the clear explanation of what is prohibited by this regulation. Finally, aside from the unreliability of Dr. Levitt's proposed testimony about Dubai being the "primary location in the world through which goods are trans-shipped to Iran," it does not logically follow from this that by shipping goods to Dubai, the Defendants must have intended them to be trans-shipped to Iran. This sort of testimony, however, delivered by a so-called expert offered by the government violates Rule 704(b) which precludes evidence going to a defendant's intent or *mens rea*.

### 2. Dr. Levitt Is Not Qualified to Offer an Expert Opinion under Rule 702

Dr. Levitt's proposed testimony can not survive the rigors of Rule 702 of the Federal Rules of Evidence and the standard established under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 589 (1993). Courts serve as gatekeepers to ensure that only reliable expert testimony reaches the jury. Rule 702 of the Federal Rules of Evidence sets forth the requirements for reliability as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has referred to the requirements of Rule 702 as the "trilogy of restrictions on expert testimony: qualification, reliability and fit." *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir. 2003). The proponent of the expert testimony must satisfy the requirements for admissibility by a "preponderance of proof." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000) (citation omitted).

As a threshold matter, it does not appear that Dr. Levitt is qualified to offer an expert opinion with respect to any of the issues in this case which, as previously discussed, relate solely to the alleged violation of the regulations regarding the indirect shipment of goods to Iran. Rather, a review of Dr. Levitt's publications reveals that he is an expert on international terrorism, with perhaps sufficient experience, education and training in international finance and banking to opine as to financial and banking sanctions as they might curtail Iran's alleged support of terrorism or the development of Iran's nuclear program. A summary of and/or excerpt from the articles offered by the government is as follows:

\*      "What Europe Can Do to Secure a Deal with Iran," *Europe's World,* Spring 2010 (#14). Levitt concludes that financial sanctions alone have not stopped Iran from pursuing its nuclear program and must be coupled with other tools such as "robust diplomacy and a credible military presence in the region," and that the United States should focus on Russia, China, the Gulf's States and America's European and Asian allies." Levitt writes that: "Multilateral action should focus on entities that support Iran's proliferation program such as financial institutions in Iran, entities owned and operated by Iran's Islamic Revolutionary Guards Corps which supports international terrorism and is involved in nuclear and missile programs;" and the Islamic Republic of Iran Shipping Lines, which is Iran's national maritime carrier, identified as being involved in proliferation shipments.

\*      "Why the Iran Sanctions Matter," *Foreign Policy*, June 11, 2010.  In this article, Levitt argues that whether employed multilaterally, regionally, or unilaterally, targeted financial measures of the kind employed by the United States are the surest way to avoid military confrontation with Iran. "Absent this leverage, policymakers on both sides of the Atlantic will eventually be left with the unenviable choice of bombing Iran or tolerating a nuclear Iran."

\*      "The World Can't Trust Iran," co-authored with Michael Jacobson, *The Guardian*, September 26, 2009. In this article, Dr. Levitt discusses Iran's "long pattern of deception" that has only recently ended with a secret uranium enrichment facility near Qom.  Levitt states that Iran has engaged in deceptive conduct along many fronts over many years, including international finance, shipping and trade.  The Islamic Republic of Iran Shipping Lines was designated by the US treasury department for its proliferation activities.  Iran has also used front companies and proxies to procure technology, including missile guidance systems, military aircraft parts and components for improvised explosive devices, which have been shipped through Dubai, Malaysia and Hong Kong.  Moreover, Iran's banks have been heavily engaged in deceptive conduct in an effort to facilitate the regime's support for terrorism.  Levitt concludes: "As Iran's record of deception makes clear, trusting in Iran's good intentions at the negotiating table is simply a fool's errand."

\*      "GAO Misleads on Iran Sanctions," *Middle East Strategy at Harvard*, January 17, 2008. According to Levitt, the GAO report should have separately analyzed the pre-2006 sanctions and from the post-2006 targeted financial measures instead of lumping the two together. The "tool most likely to alter Iran's nuclear calculus is targeted political and economic pressure, not military action." Levitt concludes that "there is plenty of evidence pointing to the fact that targeted financial measures are working."

\*      "The Clock Ticks: Sanction Iran Now," *The Washington Institute for Near East Policy*, first appearing in *Financial Times Deutschland*, December 19, 2007. In this article, Levitt opines that sanctions are still a necessary tool to alter Iran's nuclear program, and that targeted economic sanctions can take Iran "to task" for its illicit conduct, protect the international financial system from abuse and create leverage for diplomacy. The European Union is now debating whether to employ its own sanctions against Iran and will hopefully do so. "Absent this leverage, policymakers on both sides of the Atlantic will eventually be left with the unenviable choice of bombing Iran or tolerating a nuclear Iran."

\*      "Contending with Iran's Nuclear Intentions and Capabilities," *San Francisco Chronicle*, December 5, 2007. In this article, Dr. Levitt discusses his viewpoint on how financial and political sanctions can effectively deal with the "pressing issue . . . with Iran's nuclear ambitions . . . ." Dr. Levitt states: "Iran poses a proliferation threat whether it maintains an active nuclear weapons program or merely produces fissile material in a civilian program that could be quickly weaponized at a later date. Should financial and political pressure fail to create sufficient diplomatic leverage, policymakers could eventually be left with the unenviable task of deciding between using military force or tolerating a nuclear Iran. That possibility should give us all pause."

\*      "Can Sanctions Be Effective in Halting Iran's Nuclear Program?" *Council on Foreign Relations online Debate*, October 15-18, 2007. Levitt argues that graduated and targeted financial sanctions, while only being in effect for a short period of time, are working with respect to Iran's nuclear program. Short of these, negotiation and diplomacy alone will not convince Iran to give up its nuclear program. (Peter Crail, who debated Levitt, argued that negotiation is the key tool to stopping Iran's nuclear program because sanctions are not working).

\*      "Making Iran Feel the Pain," *Wall Street Journal Europe*, July 2, 2007. In this article, Levitt opines that stronger and more global sanctions are necessary to change Iran's nuclear calculus. The most effective sanctions to fill in gaps from previous ones should target Iranian banks and financial institutions and also focus on companies controlled by the Iranian Revolutionary Guard Corps, especially those involved in the oil and gas sectors.

\*      "Pulling Tehran's Purse Strings," *Transatlantic Institute*, #16, May 4, 2007. In this article, Levitt discusses how the international community should apply "carefully considered, calibrated and targeted financial measures" focused on expressly illicit conduct to change the regime behavior towards nuclear proliferation. Levitt argues that there are signs of domestic discontent within Iran and that targeted financial measures could produce further political pressure within Iran.

\*        "Target Iranian Forces," *The Washington Times*, February 15, 2007.  As Dr. Levitt writes in this article:  "The question of the day is how to avoid military confrontation with Iran while confronting the Islamic Republic over its nuclear program, its support for terrorist groups and its involvement in improvised explosive device (IED) networks in Iraq."  Dr. Levitt's answer is to apply "U.N. Security Council Resolution 1737" which requires member states to apply financial measures against the financial assets and economic resources controlled by Iran's Revolutionary Control Corps.  Dr. Levitt explains that "[t]he IRGC is deeply involved in the country's nuclear, missile and other weapons proliferation activities, and maintains a special branch-- the Qods Force-- responsible for providing funds, weapons, improvised-explosive-device technology and training to terrorist groups like Hezbollah and Hamas and insurgents attacking coalition and Iraqi forces in Iraq."

\*        "Iran Sanctions:  Can They Be Effective?"  *PolicyWatch* #1297, October 25, 2007.  In this article, Levitt argues that financial sanctions and international diplomatic censure, backed by various military options (e.g., a strong naval presence in the Persian Gulf), offer the most effective option for dealing with the threat posed by the Iranian nuclear program.

Significantly, Dr. Levitt's publications are not concerned with the trans-shipping of goods from the United States to Iran through Dubai.  The articles primarily make policy arguments for why economic sanctions are the most effective means to curtail nuclear proliferation.  Dr. Levitt explains how the nature of U.S. sanctions against Iran have evolved into being financial in nature, how such sanctions will not only curtail Iran's nuclear program,  but may also impede terrorist organizations supported by Iran and instill greater integrity in the global financial system.  In his articles, Dr. Levitt further urges the European Union to join in the sanctions imposed by the United States or leverage its own restrictions against Iran.  In sum, Dr. Levitt's publications discuss why sanctions against Iran are may be  necessary (i.e., its nuclear program); what types of sanctions are most effective (i.e., financial); the best targets of the sanctions (i.e., organizations connected to terrorism and banks in Iran); what other countries or organizations are doing or should be doing with respect to sanctioning Iran (i.e., the European Union); and the other potential benefits the world recognizes from sanctioning Iran (i.e., a more stable global financial market).  But they are largely devoid of discussion of the issues pertaining to this case -

the so-called smuggling of United States products, technology or services to Iran by persons in the United States.

Moreover, as stated above, there is no need for an evidentiary presentation to the jury regarding the impact U.S. sanctions have on Iran's nuclear program or whether financial sanctions are the most effective means to deal with the perceived threat.  Indeed, this evidence will only muddy the issues before the jury and most likely cause extreme prejudice to Mr. Vaghari.  This trial is not about the policy behind U.S. sanctions or whether such policy is sound. And, significantly, it is not about Iran's nuclear program.  Therefore, the articles cited by the government in its Memorandum do not provide any factual basis under Rule 702 from which Dr. Levitt can offer reliable testimony that the government wants to elicit from him at trial.

Nor does the fact that Dr. Levitt testified as an expert in *United States v. Banki*, 2010 WL 2076770 (S.D.N.Y. May 25, 2010), help the government's argument here.  In *Banki*, the defendant was charged with: (1) conspiracy to violate and violation of various Executive Orders and regulations issued under IEEPA, including the Iranian Transactions Regulations; (2) operating an unlicensed money transmitting business in goods, technology, or services to Iran; and (3) making materially false statements to inquiries by OFAC in violation of 18 U.S.C. § 1001.  The government essentially alleged that the defendant and unnamed co-conspirators "operated an informal value transfer system known as 'hawala' [in which] funds are transferred by customers to a hawala operator, or 'hawalader,' in one country, and then corresponding funds, less any fees, are disbursed to recipients in another country by foreign hawaladars associated with the U.S.-based hawaladar." *United States v. Banki*, 2010 WL 1875690, *1 (S.D.N.Y. May 10, 2010).  The defendant claimed that the transfers at issue were family remittances that, according to him, were lawful under the relevant regulations *See id.*  The government offered

Dr. Levitt's testimony as evidence in support of the allegation that the defendant acted as a principal who operated all or part of a money transporting business. Specifically, Dr. Levitt testified "regarding the key role Defendant and his Bank of America account could have played in the operation of the alleged hawala." *Banki*, 2010 WL 2076770, at *2. The government's questioning of Levitt included: "Does that pooling account have to belong to the broker or could it be in the possession of somebody else?" "Now, the person . . . which is identified in the schematic as pooling account/U.S. receiver, how essential is that person to the functioning of this network?" *Id.*

Significantly, this case is not about international finance or banking. The government's allegation is simply that the defendants shipped consumer goods or laboratory equipment to Dubai, knowing and intending that these goods would end up in Iran.

### 3.      Dr. Levitt's Proposed Testimony Is Not Reliable

Dr. Levitt's proposed testimony is not reliable under Rule 702 and the standard established under *Daubert*. Courts serve as gatekeepers to ensure that only reliable expert testimony reaches the jury. Under the Federal Rules of Evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. The trial judge's gatekeeping role in excluding unreliable evidence extends not only to scientific testimony, but also to testimony based on "technical" or "other specialized" knowledge such as the testimony at issue here. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999). By ensuring that expert testimony is reliable and relevant, courts "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

The government argues that "Dr. Levitt's expertise in the area of Iran sanctions derives from almost every source imaginable." Government's memo. at p.8. The government's claim regarding its expert is sweepingly broad. The government can not satisfy the rigors of Rule 702 by contending that Levitt is an expert on "Iran sanctions." For example, the government points to "his significant scholarly research on the topic" and "the think-tank that he leads in Washington" as support for his trial testimony. *Id.* However, after reading the above-summarized articles, it is clear that such articles are not relevant to (1) the issues in this case, or (2) the government's two proposed areas of expert testimony set forth in Parts A and B of its Memorandum. Moreover, while Dr. Levitt may lead a think-tank in Washington, it is obvious from his publications, lectures and symposia that the think-tank is primarily concerned with national security and trans-national nuclear and terrorist threats, particularly from Iran.[2]

The government also claims that Dr. Levitt meets the reliability standard because he "was intimately involved" with the Iranian sanctions regime on a day-to-day basis during his two years as a senior official in the Treasury Department; he updated and improved targeted financial measures "that comprise the trade sanctions on threats to American security, such as Iran;" and that his experience with the Treasury Department coincides with the alleged charged criminal conduct. *See* government's memo., at p.8. These facts add no weight to the government's argument. It appears that Dr. Levitt has and continues to focus his publications on the same type of issues he dealt with in the Treasury Department outlined above-- improving targeted economic sanctions against Iran. That Levitt worked for the Treasury Department for two of the years when the alleged conspiracy occurred does not make Levitt's testimony reliable or relevant. If the government needed an expert to testify regarding the effectiveness of financial sanctions as

---

[2]     Dr. Levitt's lectures include, but are not limited to, the following issues: "Contending with Transnational Threats," Counterterror Expo 2010, London, UK, April 15, 2010; "Targeted Financial Measures to Protect National Security," Treasury Legal division annual conference, U.S. Mint, Washington, D.C., February 29, 2008.

compared to other types of sanctions with respect to Iran's nuclear program, then Levitt would be its man. However, these issues are wholly irrelevant to the case at bar.

Finally, the government claims that the Court should consider Dr. Levitt's personal experience in deciding whether he may be offered as an expert at trial. The government points out that Dr. Levitt has personally inspected shipping ports in the United Arab Emirates, including Jebal Ali, the free trade zone near Dubai; he has devoted hours to watching boats sail down the Dubai Creek carrying goods being sent to Iran via the UAE; and he has interviewed the captains and other workers on these boats. *See* government's memo., at p.9. The government does not specify how many times Dr. Levitt inspected shipping ports and what he actually inspected; how many hours Dr. Levitt spent watching boats; how many ships he inspected; what he saw on the boats; whether any goods on the boats originated from the United States; how many people he spoke to on the boats; or whether the people he spoke to understood him and how he confirmed goods were being trans-shipped to Iran. Moreover, watching boats going down the Dubai Creek and talking to their captains and crewmen is too vague to meet the standard of reliability under Rule 702. The government has not even alleged that Defendants trans-shipped goods to Iran via Dubai by boat. The defense submits that the government is trying to pile on reasons why this Court should deem Dr. Levitt's testimony reliable under Rule 702, regardless of what the reasons are. In truth, the facts in the government's own Memorandum illustrate that Dr. Levitt is not qualified to testify as a "smuggling expert," notwithstanding his ill-defined boat watching and port inspection experiences.

Reliability requires that "the expert's opinion . . . be based on the methods and procedures of science, rather than . . . subjective belief or unsupported speculation" and that the expert have "good grounds" for the opinion. *United States v. Rich*, 326 F.Supp.2d 670 (E.D.P.A. 2004)

(Brody, J.) (citation omitted). The government has not come forward with "good grounds" for Dr. Levitt's proffered expert testimony under Rule 702 and it should be precluded.

### C.   The Proffered Expert Testimony Does Not "Fit" This Case

Contrary to its contention, the government's argument that Dr. Levitt's proffered testimony will advance the truth-seeking purpose of trial by exposing Mr. Vaghari's *modus operandi* is not supported by case law. We submit that the Third Circuit intended to be much more specific when it wrote that "[i]t is settled law that an expert may testify about common behavior patterns in a profession or subculture." *United States v. Price*, 458 F.3d 202, 212 (3d Cir. 2006). *See* government's memo., at p.11.

In support of its *modus operandi* argument, the government cites to a line of cases involving drug charges where the testifying witness was a highly trained and experienced law enforcement officer. In *United States v. Price,* 458 F.3d 202, 212 (3d Cir. 2006), the government's expert testified that drug dealers are very likely to carry guns, and buyers almost never do, "based on statistics gathered by the Philadelphia Police department," in addition to the fact that the witness police detective had been involved in narcotics enforcement for over fifteen years and had made thousands of arrests. In *United States v. Davis*, 397 F.3d 173, 178-9 (3d Cir. 2005), the expert who testified that possession of handguns, quantity of narcotics, and the circumstances of the arrest were consistent with drug trafficking was a fourteen-year veteran of the Philadelphia police force with twelve years experience in narcotics. In *United States v. Perez*, 280 F.3d 318, 342 (3d Cir. 2002), the expert who testified that drug traffickers often use pagers and cellular phones to avoid detection was "the Lieutenant of Detectives for Middlesex County, New Jersey Prosecutor's Office, and a thirty-two year law enforcement veteran." In *United States v. Rich*, 326 F.Supp.2d 670, 677 (E.D. Pa. 2004) (Brody, J.), the witness who

15

opined about drug dealers' packaging and distributing of crack cocaine had worked with the Bureau of Narcotics Investigations for sixteen years, twelve of which he spent at the Drug Enforcement Agency, and had been a police officer for eight years prior to that who was involved in over 1,800 narcotics investigations and supervised other law enforcement personnel who made drug purchases.  In *United States v. Walker*, 2008 WL 2805605, *2 (E.D. Pa. July 18, 2008) (Surrick, J.), the Court pointed out that the expert who testified about the use of a house and drug paraphernalia in drug trafficking crimes had twenty years of experience in the field investigating narcotics sales as well as extensive drug education and training.

The government also relies on *United States v. Hayward*, 359 F.3d 631, 637 (3d Cir. 2004), where a behavioral scientist expert testified "on the modus operandi- on the actions normally taken by child molesters to find and seduce their victims."  The witness described the patterns exhibited by specific child molesters, including selection of victims, formulation of a customized seduction process and isolating as well as soliciting the victim's cooperation in the process. *See id.* at 636.  The witness had been an FBI agent for 30 years, a Supervisory Special Agent in the FBI's Behavioral Sciences Unit for 20 years, was a founding member of the American Professional Society on the Abuse of Children, had authored a monograph entitled "Child Molesters and Behavioral Analysis," held two masters degrees and taught university courses in behavioral science. *See id. Hayward* is a prime example where an expert's qualifications and reliable testimony "fit" the unique facts of the case in which his testimony was offered.

While experts have been permitted to testify concerning the *modus operandi* of certain types of defendants engaged in specific activity, Federal Rule of Evidence 704(b) bars an expert from testifying as to a defendant's mental state.  The Third Circuit has warned that there is "a

16

[fine] line that expert witnesses may not cross." *United States v. Watson*, 260 F.3d 301, 308 (3d Cir. 2001) (internal citations omitted). "Expert testimony is admissible if it merely 'supports an inference or conclusion that the defendant did or did not have the requisite *mens rea*, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony.'" *Watson*, 260 F.3d at 308, *citing, United States v. Bennett*, 161 F.3d 171, 183 (3d Cir. 1998).

Rule 704(b) is violated when a prosecutor's question is designed to elicit the expert's testimony about the mental state of the defendant, or when the expert triggers the application of Rule 704(b) by directly referring to the defendant's intent, mental state or mens rea. *Watson*, 260 F.3d at 309. (internal citations omitted). "Rule 704 prohibits "testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite mens rea." *Id.* (internal citations omitted).

The Third Circuit held that the government violated Rule 704(b) in *United States v. Watson*, 260 F.3d 301, 309 (3d Cir. 2001)[3] where the prosecutor's questions to the government's experts, experienced narcotic agents, were designed to elicit testimony about the defendant's intent. The defendant was charged with distribution and possession with intent to distribute crack cocaine after Pennsylvania law enforcement officers received information that the defendant would be traveling on a certain bus to purchase drugs, and arrested the bus-riding defendant who had drugs in his possession.

The Court held that the prosecutor "pushed his questions too far" in more than one instance. *Id.* First, one agent's testimony concerning the purpose for the 100 plastic bags found on the defendant's person violated Rule 704(b) because the question was designed to elicit the expert's testimony about the defendant's intent-- that he possessed with the intent to distribute to

---

[3] This cased is cited to on page 11 of the government's Memorandum.

someone else. *See id.* The Court also held that prosecutors can not circumvent Rule 704(b) by referring to the defendant's intent in his question and allowing the expert to answer with a "Yes, sir," and some explanation of his answer but without using the word "intent" in his answer. This was a second violation of Rule 704(b). *See id.* Finally, the prosecutor violated Rule 704(b) when he asked a third agent whether the defendant's bus trip was for the purpose of drug distribution as opposed to procuring drugs for personal use even though the agent did not specifically refer to the defendant in his response and used a collective "they" when indicating that "they'd" gone into the city to purchase drugs to bring back and sell them because the agent's opinion implied that the defendant's bus trip was to distribute drugs rather than to obtain drugs for personal use. The Court noted that such testimony not only violated Rule 704(b) but clearly went beyond the witness's competence. *See id.* at 310. Additionally, the Third Circuit held that "by letting this testimony stand as expert opinion, the District Court allowed [defendant's] credibility" because the defendant testified to a contrary fact at the trial. *Id.*

In sum, the government in *Watson* violated Rule 704(b) by repeatedly eliciting from its experts testimony as to the defendant's mental state and the purpose of his actions. The defendant's intent is an ultimate issue of fact the jury alone must decide. Fed.R.Evid. 704(b). *See also Watson*, 260 F.3d at 310. The Court held that the district court erred when it admitted the government's expert testimony concerning the defendant's mental state and that such evidence "went to the heart of the [g]overnment's case and plainly prejudiced the defendant." *Watson*, 260 F.3d at 310.

In *United States v. Gibbs*, 190 F.3d 188, 211 (3d Cir. 1999), a government agent was permitted to testify to the meaning of coded drug language where the purpose of the coded language was to conceal the meaning of the conversation from outsiders. The Court explained

18

that such testimony was uncontroversial because it permitted an agent to explain the actual meanings of coded words and act as a translator. *See id.* The Third Circuit, however, went on to note that "[w]e have upheld the exclusion of expert testimony when that testimony ventures into areas in which the jury needs no aid or illumination." *Id.* at 212. The Third Circuit held that the district court abused its discretion in failing to exclude the agent's testimony concerning uncoded portions of the defendant's conversations because it was the function of the jury to determine what these portions of the conversations meant. *See id.* at 213. The Court further found that the agent's testimony was not helpful to the jury and, in fact, the only purpose of the testimony was to bolster some of the government's allegations regarding the defendant. *See id.*

In *United States v. Hill*, 167 F.3d 1055, 1069 (6th Cir. 1999), involving illegal gambling charges, the Sixth Circuit affirmed the district court's evidentiary ruling to preclude proffered testimony regarding the "scope of Tennessee's gambling laws" because it was the court's task to instruct the jury on the law, and it was the jury's task to then consider evidence regarding the defendant's conduct to determine whether the defendant violated the law.

By contrast to the above-summarized cases, this case does not present the necessity for the jury to understand a fact or a *modus operandi* which is beyond its common understanding. Defendants are charged with shipping products to Dubai, intending that they will end up in the hands of customers in Iran. Moreover, while Dr. Levitt is an interesting and scholarly person, his credentials simply do not fit the opinions that the government is trying to shoehorn them into. Finally, the danger of unfair prejudice resulting from the government's questioning of Dr. Levitt is extremely high in light of what we know about his political bias and his high degree of expertise in terrorism.

## III.   CONCLUSION

19

For all the foregoing reasons, Defendant Mohammad Vaghari respectfully requests that the Court preclude the government from eliciting any expert or percipient witness testimony at trial from Dr. Matthew Levitt.

Respectfully Submitted,

(s) *William A. DeStefano*
William A. DeStefano
Terri A. Pawelski
Buchanan Ingersoll & Rooney PC
Two Liberty Place
50 S. 16 Street, Suite 3200
Philadelphia, PA 19102
215-665-3887/3809

## CERTIFICATE OF SERVICE

I hereby certify that this day a true and correct copy of the foregoing Defendant's

Memorandum in Support of Motion to Preclude the Government from Offering Expert

Testimony of Dr. Matthew Levitt at Trial was served this day by electronic means upon the

following counsel.


Stephen A. Miller, AUSA
Nancy B. Winter, AUSA
United States Attorney's Office
615 Chestnut Street - 12th Floor
Philadelphia, PA 19106

David Koslow
Mark Wilson
Federal Defenders Office
Curtis Center - 601 Walnut Street
Suite 540
Philadelphia, PA 19106


_____
/s/ Terri A. Pawelski


Dated:  June 25, 2010